# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.: _____

DELWIN LESTER, an individual,

      Plaintiff,

v.

SHADOW MOUNTAIN MANAGEMENT CORPORATION, a Colorado Corporation, and THE GRAND LODGE OF THE INDEPENDENT ORDER OF ODD FELLOWS OF COLORADO, a Colorado non-profit corporation,

      Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff Delwin Lester ("Mr. Lester"), by and through counsel, Leventhal Lewis Kuhn Taylor Swan PC, submits his Complaint and Jury Demand against Shadow Mountain Management Corporation ("SMMC") and The Grand Lodge of the Independent Order of Odd Fellows of Colorado ("IOOF") (collectively "Defendants") as follows:

### Parties, Jurisdiction, and Venue

1. Mr. Lester is an individual domiciled in Salida, Colorado.

2. Defendant SMMC operates several health care facilities in Cañon City, Colorado, including the Hildebrand Care Center ("HCC").

3. Defendant IOOF owns SMMC, HCC, and all other health care facilities associated with the collection of entities within which SMMC and HCC operate in Cañon City, Colorado.

4. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action is brought, in part, under 31 U.S.C. § 3730.

5. This Court has supplemental jurisdiction over the claims asserted under Colorado law pursuant to 28 U.S.C. § 1367 because they are so related to the claims arising under federal law that they form part of the same case or controversy.

6. Venue is proper in this Court because, among other things, the claims alleged in this Complaint arise out of conduct that occurred, in whole or in part, the State of Colorado.

## General Allegations

7. SMMC employed Mr. Lester as a licensed Nursing Home Administrator ("NHA") from May 14, 2018 through November 10, 2022 at the HCC facility. At all times during his employment, Mr. Lester's performance was exemplary. He consistently received high praise for his performance and was never placed on a performance improvement plan, never received any form of employee discipline, and never received any verbal or written warnings.

8. HCC is a for-profit nursing home owned by SMMC, which is in turn owned by IOOF, a 501(c)(3) corporation.

9. IOOF runs a "campus of care" involving several subsidiary health care entities that coordinate operations. During all times relevant to this Complaint, Mr. Lester was heavily involved in campus of care issues in addition to his duties as NHA of HCC.

10. The IOOF is a fraternal organization that owns both charitable and for-profit companies.

11. HCC is governed by the SMMC Board of Directors ("SMMC Board"), which is typically occupied by five independent Board members.

12. IOOF is governed by the Board of Trustees, all of whom are members of the fraternal order ("Trustees").

13. For years, SMMC charged HCC hefty monthly "service fees." However, SMMC never provided commensurate services to HCC in exchange for these fees.

14. SMMC funds were then funneled to IOOF.

15. The service fees were paid, in part, by Medicaid, Medicare, and other state and federal funds.

16. In 2021, Katherine Baxter, a former employee of Three Links (another IOOF facility), submitted whistleblowing reports to SMMC and the United States Department of Urban Housing and Development ("HUD") regarding service fees paid to SMMC by Three Links under a substantively identical policy to that between SMMC and HCC. In her complaints, Ms. Baxter explained that SMMC was violating the False Claims Act (31 U.S.C. § 3729) every time it paid an invoice for services that were never rendered.

17. The Chairman of the SMMC Board at the time was Bud Corey. Mr. Corey and Mr. Lester worked with the greater campus of care team to respond to Ms. Baxter's report.

18. After evaluating the relevant regulations and financial documents, Mr. Corey and Mr. Lester agreed with Ms. Baxter that there were deep issues, including legal problems, with the false services contracts.

19. After conducting their own investigation, HUD fired SMMC from the Three Links facility and ceased making payments on the false services contracts. Mr. Lester was named as a witness in the HUD investigation in June of 2022.

20. Mr. Corey also ended the services contract disbursements to SMMC from HCC in November 2021.

21. Jay Fernandez was at all relevant times the Chairman of the IOOF Board of Trustees. Mr. Fernandez was furious at Ms. Baxter for reporting this issue and his wrath extended to anybody who, like Mr. Lester, supported or agreed with Ms. Baxter's conclusion that the services contracts were illegal.

22. Ms. Baxter would later be forced to resign from Three Links in retaliation for her whistleblowing activity.

23. Mr. Corey's decision to bring HCC into compliance with state and federal law prompted Mr. Fernandez, on behalf of the Trustees and the Executive Committee, to demand "a written list of all administrative or other complaints or reports filed or made against the Trustees or Grand Lodge by Shadow Mountain, its board, or its employees regarding the Campus of Care issues made within the last 6 months" in an email to Mr. Corey on November 22, 2021.

24. This email was aimed at learning the identities of other whistleblowers, as IOOF began a campaign to remove any dissenting voices from the campus of care employee roster.

25. Mr. Fernandez remained furious at Mr. Lester for the stoppage of the SMMC services contracts long after Mr. Corey stopped payments to SMMC in November 2021.

26. For example, on May 31, 2022, Mr. Fernandez wrote in an email to the Trustees and new SMMC Board, "Odd, since 2014 [Mr. Corey] had no problem with the management arrangement, and [Mr. Lester] had no problems since he started working there. Well, it appears that [Mr. Corey] and [Mr. Lester] have decided to join the others that do not want to fund [SMMC] regardless of the services provided. I suggest that instead of having to jump through the ever moving hoop at [HCC], SMMC stops providing HCC any services, collects no fees, and every penny of profit is paid directly to [IOOF] as a dividend."

27. On the same day, Mr. Corey wrote to Mr. Lester, "Due to the operating losses of [HCC] due to low census, COVID, and *no services being provided* for a Management Fee to [SMMC]. [*sic*] It was my decision to stop the cash transfer to the corporate office in October, 2021. *At the advice of our Auditors* [*sic*], this fee can not [*sic*] be added to the cost of operations and not added to the medicaid [*sic*] report on Med 13 [*sic*]. This fee was started by Rockey Wells and is not proper." (Emphasis in original.)

28. In response to Mr. Fernandez's allegations toward Mr. Corey and him, Mr. Lester wrote, "Since my arrival, I have had discussions with Bud Corey regarding these fees without the required services provided, as they are mostly funded by [Medicaid and Medicare] funds… This was 'finally' brought to a head last year and forced a change by the SMMC president, Bud Corey… As for 'services provided' by SMMC, there have been NONE (See Bud Corey's email I sent yesterday). Per your request [Mr. Fernandez], I sent you and [Terry Dalpiaz] a partial list of services normally provided by a SNF/LTC management company for fees charged, and you know as well as I do, NONE of these have ever been provided by SMMC. If you think SMMC has provided required management services to HCC, *then please give detail to those routine services provided*. I find it 'odd' you wish to 'stop providing HCC any services', when none have ever been provided." (Emphasis in original.)

29. Mr. Lester continued in his whistleblowing email, "As far as your request to pay 'every penny of profit' to [IOOF] as a dividend, I strongly suggest you learn the requirements of [Medicaid and Medicare] 'tax payer' funding to a SNF/LTC and it [*sic*] restrictions and intended usage for the care of its residents. Holding an emergency cash reserve is one of those financial stewardships required. If you wish to continue down this path, it has great potential to result in

5

complaints and investigations by [Medicaid and Medicare] and other government entities, and depending on those results, it could result in fraud charges and other. The duties and mission of HCC is the care of its residents, families and staff, and we do not exist to be a bank or cash machine for [IOOF]."

30. In addition to the issues surrounding the false services contracts with SMMC, Mr. Lester submitted whistleblowing complaints regarding the IOOF's violations of state employment law and federal tax law to the Board, the Trustees, and relevant federal and state authorities after SMMC and IOOF refused to remediate his concerns.

31. For example, in July 2021, the IOOF Trustees forced SMMC to appoint Chad Parker as the Director of Operations at the Grand Lodge, a position that paid approximately $120,000 per year.

32. Mr. Parker has no experience, degrees, certifications, or qualifications in managing medical facilities. At the time of his appointment, Mr. Parker was one of five IOOF Trustees and a registered member of the fraternal order. He was also looking for work after experiencing major setbacks in his career as an insurance salesman.

33. To employ Mr. Parker with a six-figure salary, SMMC created the position of "Grand Lodge Director of Operations" and hired Mr. Parker for the role without internally posting the job opportunity, taking applications from other individuals, or otherwise opening the position for general applications in violation of the Equal Pay Transparency Rules. *See* Colo. Rev. Stat. § 8-5-201 *et seq.*

34. Additionally, under federal law, it is illegal for non-profit organizations to use any part of their net earnings to directly benefit members of their governing bodies. *See* 26 U.S.C.

6

§501(c)(4). This standard is even higher when, as with Mr. Parker, the individual in question is unqualified for a position of authority within the 501(c)(3) corporation to which he or she is appointed and would not have been appointed without undue influence. *See id*. The above conduct is a violation of the federal tax code and may subject offending organizations to steep penalties and fines. *See id*.

35. Mr. Lester first became aware of Mr. Parker's hiring in the fall of 2021. Immediately after he became aware of the situation, Mr. Lester complained to Mr. Corey that he believed Mr. Parker's appointment violated Colorado and federal law. Mr. Corey agreed with Mr. Lester's assessment.

36. The SMMC Board meeting and the IOOF Board of Trustees meetings occurred concurrently in November 2021. At the meeting, Mr. Corey and Mr. Lester explained their reasonable concerns and explained the liability risk posed by IOOF's hasty and ill-thought-out decision to hire Mr. Parker. Their good faith report of illegal activity was met with open hostility by the Trustees but was received more warmly by the then-independent SMMC Board.

37. At the meeting, the SMMC Board resolved to hire a corporate attorney to attend the December 2021 Board meeting for the purpose of educating the Board on non-profit governance so that any similar legal violations could be avoided in the future.

38. The IOOF Trustees concluded the November 2021 Board meeting by refusing to rectify their actions regarding Mr. Parker's improper hiring.

39. Because his complaints were ignored by the Trustees, Mr. Lester had no further recourse available within HCC, SMMC, or IOOF. Accordingly, he submitted a whistleblower

complaint to the United States Internal Revenue Service on November 15, 2021 detailing his concerns regarding Mr. Parker.

40. Mr. Lester also contemporaneously filed a whistleblower complaint with the Colorado Department of Labor and Employment regarding SMMC's and IOOF's violations of Colorado's Equal Pay Transparency Rules.

41. Pursuant to the Board's ratification of a resolution to do so, Mr. Corey moved forward with hiring a corporate attorney to attend the December 2021 Board meeting and conduct training.

42. Between the November 2021 and December 2021 Board meetings, Mr. Fernandez furiously opposed retaining corporate counsel. Mr. Fernandez characterized such an action as being "threatened" by lawyers.

43. Because Mr. Fernandez is an IOOF Trustee and not an SMMC Board member, he did not have the authority to override the SMMC Board's resolution from the November 2021 meeting to hire corporate counsel.

44. The next Board meeting was scheduled for December 21, 2021. On December 14, 2021, Mr. Fernandez took the extraordinary step of dissolving the entire SMMC Board, including Mr. Corey, to prevent a corporate attorney from attending the December 21, 2021 Board meeting.

45. Upon information and belief, Mr. Fernandez did so without contemporaneously filing the appropriate notice to the Colorado Department of Public Health and the Environment ("CDPHE"). Under Colorado law, a facility must provide written notice to the governing state agency at the time any change occurs with the officers, directors, agents, or managing employees. *See* 48 C.F.R. 438(k)(2).

8

46. It took Mr. Fernandez several weeks to appoint a new SMMC Board. The Board was no longer independent of the Trustees but was instead filled with individuals also sitting on the Board of Trustees who were loyal to Mr. Fernandez.

47. The organization received a "tag" (notice of deficiency) from the CDPHE for failing to provide continuous corporate governance, as required by state law, in January 2022. Mr. Fernandez's impulsive dissolution of the SMMC Board in December 2021 directly caused this tag to be issued.

48. In 2022, new Colorado regulations required nursing homes to submit annual audits to the Colorado Department of Health Care Policy & Financing ("HCPF") as a prerequisite to receiving Medicare and Medicaid funding.

49. These programs are a crucial source of funding for HCC.

50. Early in 2022, Mr. Lester made Mr. Dalpiaz and Bob Hamby, both of whom were SMMC Board members and Trustees, aware of such requirements.

51. HCC had contracted with the same auditor, Todd Mihelic, for many years. Mr. Mihelic attempted to conduct HCC's required audit for 2022 as required by state law.

52. To complete the audit, Mr. Mihelic was required to provide information about the liabilities and potential liabilities of HCC, including any pending or potential legal actions. This information would include each of the complaints described *supra*, in addition to requiring complete financial transparency.

53. At every turn, the Board refused to provide Mr. Mihelic with necessary information relating to the various potential legal actions against SMMC.

54. Mr. Lester attempted to obtain the information from Mr. Hamby and Mr. Dalpiaz several times in October 2022. They refused to provide the information Mr. Mihelic needed.

55. Mr. Mihelic sent several emails and letters to SMMC explaining that, without their full cooperation, he would terminate his representation of the organization immediately.

56. Mr. Lester was unable to complete the facility audit required by state law before the deadline because Mr. Dalpiaz and Mr. Hamby refused to cooperate with Mr. Mihelic.

57. To prevent immediate loss of funding from Medicare and Medicaid, Mr. Lester had to reach out to HCPF and beg the state government not to punish HCC for SMMC's negligence. Mr. Lester successfully delayed a funding crisis, despite the willful obstruction of Mr. Dalpiaz and Mr. Hamby.

58. Weeks later, on November 10, 2022, Mr. Parker walked into Mr. Lester's office and terminated him without cause.

59. Mr. Lester's performance during his employment was exemplary, especially considering that he was the steward of a nursing home during the global COVID-19 pandemic.

60. For example, under Mr. Lester's care and direction, HCC was free of any deficiencies on four separate "Focused Infection" control health surveys during COVID and was among the most compliant nursing homes in Colorado in 2022 after completing its CDPHE recertification survey and Life Safety Code Survey.

61. Additionally, on Mr. Lester's watch, *not a single resident* of HCC died because of COVID despite the fact that the elderly population of the facility was considered the highest risk group for serious complications and death.

62. During his employment, each of Mr. Lester's performance evaluations reported that he exceeded expectations in his assigned job duties. These evaluations provided detailed analysis of Mr. Lester's job performance of each duty and explained the reasoning behind his scores.

63. The only exception was Mr. Lester's 2022 evaluation conducted by Mr. Dalpiaz, who became the SMMC President after Mr. Fernandez dissolved the entire SMMC Board in December 2021 and installed his puppet Board.

64. In that evaluation, Mr. Dalpiaz did not reference a single job duty nor assess Mr. Lester's performance of the same. He merely made vague suggestions that Mr. Lester improve his relationship with the Board and noted the brief dip in profitability that occurred during the worst quarter of the COVID pandemic. He failed to provide any other feedback, positive or negative.

65. This was far from standard practice for conducting evaluations and reflected the basis for Mr. Dalpiaz's bias against Mr. Lester for refusing to rubberstamp illegal SMMC and IOOF policies.

66. Mr. Lester received no warning, performance improvement plans, counseling (verbal or written), or any disciplinary actions during his employment.

67. Regardless, Mr. Lester was terminated by Mr. Parker on November 10, 2022. Mr. Parker provided no explanation, much less cause, for Mr. Lester's termination.

68. Mr. Lester was terminated mere weeks after clashing with Mr. Hamby and Mr. Dalpiaz about their obstruction of Mr. Mihelic's facility audit, which was required by state law, and which would have required SMMC to be transparent about the many legal and financial problems at the organization. Mr. Lester was a key player in reporting many of the legal issues that would have been disclosed in the audit.

11

69. Mr. Lester was terminated in retaliation for engaging in protected activity, specifically, for supporting Ms. Baxter's and Mr. Corey's efforts to remediate the False Claims Act violations, for complaining about the illegal hiring of Mr. Parker, and for attempting to comply with state and federal law and providing a detailed facility audit so that HCC could receive Medicaid and Medicare funds.

70. SMMC's unlawful termination of Mr. Lester has caused, and is continuing to cause, him immense financial, reputational, and emotional damage.

71. Mr. Lester has exhausted all administrative remedies regarding SMMC's and IOOF's violations of law.

### First Claim for Relief
**(Retaliatory Discharge – 31 U.S.C. § 3730)**
*Both Defendants*

72. The preceding paragraphs are incorporated as if set forth in full herein.

73. At all times during this controversy, Mr. Lester was employed by HCC, which is owned and operated by SMMC, which is in turn owned and operated by IOOF.

74. For years, SMMC received substantial monthly payments from HCC, Three Links, and other facilities within the IOOF Campus of Care purportedly for "services contracts."

75. The proceeds of the SMMC service contracts directly benefitted IOOF and its members.

76. For example, Mr. Parker's six-figure salary was paid for, at least in part, by the proceeds of these services contracts. Mr. Parker was an IOOF Trustee and a member of the fraternal order who was hand-selected by the IOOF Trustees for an executive level healthcare

administration position without any prior experience, education, or certifications related to healthcare.

77. No services were performed by SMMC pursuant to these contracts.

78. HCC, Three Links, and other IOOF facilities receive substantial federal funding through Medicare, Medicaid, HUD, and other federal programs.

79. The federal government reimbursed HCC, Three Links, and other IOOF subsidiaries for all or part of the money demanded by SMMC and IOOF under these contracts.

80. The federal funds provided to HCC, Three Links, and other IOOF subsidiaries were provided for the purpose of advancing government programs and government interests in health care and housing.

81. IOOF and SMMC knew, or should have known, that HCC and Three Links are funded, in whole or in part, by federal funds through various welfare programs.

82. IOOF and SMMC knew, or should have known, that no services were provided in exchange for these substantial monthly fees.

83. Based on the above, SMMC and IOOF knowingly presented, or caused to be presented, false or fraudulent claims for payment to the federal government for IOOF and SMMC's benefit.

84. Ms. Baxter, a former Three Links employee, worked closely with Mr. Lester and former SMMC Board President Mr. Corey in the larger SMMC Campus of Care. In 2021, Ms. Baxter raised concerns about the fraudulent services contracts.

85. Mr. Lester and Mr. Corey agreed with Ms. Baxter's complaint and took several affirmative actions to stop the fraudulent transactions.

86. By way of non-exhaustive example, Mr. Lester and Mr. Corey worked together to stop the SMMC services contracts altogether in October 2021.

87. Seven months later, on May 31, 2022, Mr. Fernandez expressed his ongoing outrage at Mr. Lester and Mr. Corey for stopping the payments.

88. In June 2022, Mr. Lester was named as a witness by a HUD investigator who was looking into the False Claims Act violations.

89. Ms. Baxter complained that SMMC and IOOF retaliated against her for reporting the false claims.

90. Later in 2022, Ms. Baxter was forced to resign in retaliation for reporting the false claims.

91. In the fall of 2022, Mr. Lester was obstructed from performing a thorough audit of HCC's finances and liabilities by SMMC Board members and IOOF Trustees, which would have required SMMC to provide information about the false services contracts and the employment disputes that arose from SMMC's and IOOF's retaliation toward employees.

92. Weeks later, Mr. Lester was terminated without cause on November 10, 2022.

93. Mr. Lester was terminated because of the lawful acts he undertook within the scope and course of his employment to stop SMMC's and IOOF's ongoing violations of 31 U.S.C. § 3730.

94. Mr. Lester suffered damage as a result of his wrongful termination by SMMC and IOOF in an amount to be proven at trial for which Defendants are liable.

**Second Claim for Relief**
**(Retaliatory Discharge – Colo. Rev. Stat. § 8-5-201 *et seq*. and 7 Colo. Code Regs. 1103-11)**
*Both Defendants*

95. The preceding paragraphs are incorporated as if set forth in full herein.

96. Under the Colorado Equal Pay for Equal Work Act, it is illegal to discharge, discipline, discriminate against, coerce, intimidate, threaten, or interfere with an employee because the employee inquired about, complained about, reported, or otherwise discussed an employer's violation of its requirements under the Equal Pay Transparency Rules. *See* Colo. Rev. Stat. § 8-5-201 *et seq.*; *see also* 7 Colo. Code Regs. 1103-11-2.11, 2.11.2.

97. An employer who violates this section may be ordered to provide legal and equitable relief which may include reinstatement, fines, payment of lost wages, and liquidated damages. *See* 7 Colo. Code Regs. 1103-11-3.5.3.

98. Colo. Rev. Stat. § 8-5-201 requires that employers make reasonable efforts to announce, post, or otherwise make known all opportunities for promotion to all current employees on the same calendar day and prior to making a hiring decision.

99. SMMC and IOOF are both employers within the meaning of the statute.

100. The position of "Director of Operations" would have been a promotional opportunity for at least one SMMC or IOOF employee. Therefore, SMMC and IOOF were required to provide all employees notice of the position prior to making a hiring decision.

101. At the direction of IOOF, SMMC made no such posting in 2021 for the position of "Director of Operations."

102. At the direction of IOOF, SMMC hired Mr. Parker in July 2021 without formally considering or interviewing other candidates.

103. At the SMMC Board meeting in December 2021, Mr. Lester submitted a good-faith complaint that SMMC violated its obligations under the Equal Pay Transparency Rules when the

15

organization hired Mr. Parker without posting a notice to employees before a hiring decision was made.

104. SMMC is owned by the IOOF.

105. The SMMC Board of Directors was prevented from taking remedial action by the IOOF when Mr. Fernandez dissolved the entire SMMC Board on December 14, 2021.

106. The new SMMC Board, which consisted entirely of IOOF Trustees, refused to take remedial action.

107. Accordingly, Mr. Lester submitted a complaint to the Colorado Department of Labor and Employment regarding SMMC's violation of law.

108. SMMC and IOOF took adverse employment action against Mr. Lester when he was terminated on November 10, 2022 by Mr. Parker. No reason was provided for Mr. Lester's termination.

109. Mr. Lester was terminated, in part, because he reported the illegal conduct of SMMC and IOOF when they hired Mr. Parker without first complying with the requirements of the Equal Pay Transparency Rules.

110. Mr. Lester suffered damage as a result of his wrongful termination by SMMC and IOOF in an amount to be proven at trial for which Defendants are liable.

### Third Claim for Relief
**(Wrongful Termination in Violation of Public Policy)**
*Both Defendants*

111. The preceding paragraphs are incorporated as if set forth in full herein.

112. During the course and scope of his employment with SMMC, Mr. Lester raised concerns about SMMC's violations of state and federal law.

16

113. These concerns included, but are not limited to: reports that SMMC's empty services contract violated the False Claims Act (31 U.S.C. § 3729); reports that SMMC's hiring of Mr. Parker violated the Equal Pay Transparency Rules (C.R.S. § 8-5-201 *et seq*., 7 CCR 1103-11-2.11, 2.11.2); reports that SMMC's hiring of Chad Parker was a violation of tax law (26 U.S.C. § 501(c)(4)); and for attempting to comply with Colorado law requiring a facility audit prior to receiving Medicaid and Medicare funds.

114. Mr. Lester's activity in raising these legitimate concerns involved an exercise of statutory, regulatory, and/or rule-based rights related to the public welfare.

115. Mr. Lester's activity involved the performance of a public duty relating to his basic responsibilities as a citizen and an exercise of important work-related rights and/or privileges.

116. The proper use of public funds, the hiring of qualified health administrators, complying with Colorado law regarding wage transparency, and conducting required financial audits are clear mandates of public policy for purposes of establishing a claim for wrongful termination in violation of public policy.

117. Through its employees, SMMC was actually aware that Mr. Lester had engaged in protected activity. Minimally, SMMC reasonably should have been aware that Mr. Lester had engaged in protected activity.

118. SMMC retaliated against Mr. Lester by terminating his employment for reporting the violations of law described *supra*.

119. Mr. Lester suffered damage as a result of his wrongful termination by SMMC and IOOF in an amount to be proven at trial for which Defendants are liable.

WHEREFORE, Mr. Lester respectfully prays this Court (1) award damages in an amount to be proven at trial; (2) award Mr. Lester his attorneys' fees and costs of this action as provided by applicable law; and (3) award such other relief as the Court deems appropriate. Mr. Lester reserves the right to amend the operative complaint at an appropriate time to seek exemplary damages.

**TRIAL BY JURY IS DEMANDED**

DATED this 4th day of October, 2023.

> LEVENTHAL | LEWIS
> KUHN TAYLOR SWAN PC
>
> */s/ Andrew E. Swan*
> Andrew E. Swan, #46665
> Keslie R. Cooper, #54987
> 24 South Weber Street, Suite 205
> Colorado Springs, Colorado 80903
> Telephone:  (719) 694-3000
> Email:       aswan@ll.law
>                    kcooper@ll.law
>
> *Attorneys for Plaintiff*